# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TATIANA MCFADDEN,<br>MONICA CHAVEZ, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-00461-TWP-MKK |
| | ) | |
| FIRST AMERICAN TITLE INSURANCE<br>COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant First American Title Insurance Company ("First American") (Filing No. 51). Plaintiffs Tatiana McFadden ("McFadden") and Monica Chavez ("Chavez") (collectively, "Plaintiffs") initiated this action alleging that their former employer, First American, decreased their salary and commission due to their sex (female) and national origins (Chavez-Hispanic and McFadden-Belarusian) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and the Equal Pay Act (Filing No. 8). First American seeks a summary judgment. For the following reasons, First American's Motion is **granted**.

## I.    BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Plaintiffs as the non-moving parties. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.    **Plaintiffs' Employment**

Both McFadden and Chavez voluntarily resigned from First American in September 2023 (Filing No. 64-3 at 142:2–3; Filing No. 64-4 at 133:15–18).

McFadden, a Belarusian woman, moved to the United States in 2002 and began working for First American the same year as a copy clerk (Filing No. 52-2 at ¶ 2; Filing No. 64-3 at 12:1–5, 23:1–3). Aside from a period between 2011 to 2013, McFadden worked at First American for nearly twenty years in several different roles until her resignation in 2023 (Filing No. 64-2 at 24:11–15, 36:16–22, 136:9–1, 142:16–19). Her last role was a promotion to national sales executive ("Sales Associate") where she performed well, consistently receiving positive performance evaluations (Filing No. 64-1 at ¶¶ 4–6).

Chavez is a Hispanic woman who began working at First American in 2003 as an escrow assistant (Filing No. 64-2 at ¶ 2–3). Chavez was promoted several times, and at the time of her resignation in 2023, she served as both a Sales Associate and an escrow manager (Filing No. 64-4 at 19:–22:5). She consistently received positive performance evaluations and was given a prestigious award for her job performance (Filing No. 64-2 at ¶ 4).

Sales Associate compensation at First American includes a salary with additional commission on sales outlined in a written commission plan (Filing No. 64-5 at 27:18–28:5). During her employment with First American, Chavez proposed forming a partnership with McFadden, which was later approved (Filing No. 64-4 at 169). McFadden and Chavez shared sales accounts and worked as a "duo" earning a combined commission on all accounts and splitting the commission equally (Filing No. 64-1 at ¶ 9; Filing No. 64-2 at ¶ 6). McFadden enjoyed working directly with Chavez because she believed working as a team provided better service to their clients, as two people could handle transactions more effectively than one (Filing No. 64-3 at 48).

At the start of 2023, the duo was earning a combined 14% commission on all accounts (Filing No. 64-1 at ¶ 9; Filing No. 64-2 at ¶ 6).  Specifically, each of their commission plans stated that "[t]he Participant will receive 7% of the Commissionable Revenue generated on all shared accounts." (Filing No. 52-6; Filing No. 52-7). Plaintiffs are unaware of any other Sales Associates that regularly worked as a team and earned joint commissions on all accounts (Filing No. 64-3 at 48:6– 9; Filing No. 64-4 at 49:19–23). In early 2023, Plaintiffs were the only Sales Associates working in the Indianapolis office (Filing No. 64-3 at 50:7–12).

The record on the supervision and management structure at First American is murky. Plaintiffs assert that Gina Longere ("Longere") served as their direct manager and Indianapolis operations manager; Jamie Burt ("Burt") served as the divisional manager for Indiana and Michigan, and supervised Longere; and Burt was supervised by Donna St. George ("St. George") who served as the managing director of the Midwest division (Filing No. 64-1 at ¶ 6–7; Filing No. 64-2 at ¶ 5). But Longere testified that Burt was the "profit center manager" of the Indianapolis office, and that Jeff King ("King") was the regional sales director who her two Sales Associates, McFadden and Chavez, reported to at the time of the restructuring (Filing No. 64-7 at 34:13–21, 116:9–11, 147:7–16).

Plaintiffs' contend that the regional profit center managers, "such as Burt and Longere," supervised sales teams across both Indiana and Michigan, (Filing No. 64 at 20), but Burt testified that he alone served as the profit center manager for Indiana and Michigan (Filing No. 64-6 at 94:4–6). What is clear is that Burt managed four salespeople in his role, including the two Indiana Sales Associates, McFadden and Chavez, and the two Sales Associates in Michigan, and that he reported to St. George when she was Midwest director (Filing No. 64-6 at 94:13–15; 14:13–22).

3

**B.**    **Salary Reduction and Commission Restructuring**

In November 2022, First American began having discussions about reducing expenses when national CFO Eric Youhengler gave a presentation foreshadowing of market conditions deteriorating, and it was "broad-brushed" that they would have to make expense reductions nationwide (Filing No. 64-6 at 14). In January 2023, Plaintiffs were told that their commission and salaries would be decreased due to corporate cuts nationwide (Filing No. 8 at ¶ 11).

Plaintiffs dispute who made the decision to restructure their commission. Burt affirms that he had to create a plan and submit it to St. George for approval (Filing No. 64-6 at 59:6–23). Longere and Burt had initial conversations on how to reduce expenses in the Indianapolis office and Burt indicated that Longere would need to reduce expenses by about $300,000.00 (Filing No. 64-7 at 30:6–17, 35:1–4; Filing No. 64-6 at 73:2–7). Longere proposed eliminating four positions to try to hit Burt's target number for the Indianapolis office without reducing Plaintiffs' commission (Filing No. 64-7 at 30:6–17). But this resulted in proposed expense reductions that were short of the goal (*See* Filing No. 64-11). Burt indicated to Longere that there were other options to reduce expenses, and they discussed the potential restructuring of Plaintiffs' commissions (Filing No. 64-7 at 30:24–31:6). The plan Burt ultimately submitted to, which was approved by St. George, included Longere's proposed terminations of four positions and a reduction in Plaintiffs' commission (Filing No. 64-6 at 71:8–20). St. George then had a conversation about the plans and submitted the plans nationally to her boss, the division president, for each of her profit center managers (Filing No. 64-5 at 40:21–41:7).

While Plaintiffs dispute the reason for their commission restructuring, it is undisputed that the changes occurred nationwide, amid other cuts at First American, including several employee salary reductions, terminations, and layoffs (Filing No. 64-3 at 72:25–73:25; Filing No. 64-4 at

96:6–19; Filing No. 64-7 at 29:1–11). On January 11, 2023, Burt informed Plaintiffs of the new commission plan, to be effective February 1, 2023. The plan was the same for both McFadden and Chavez and defined their team as "the two women in the Indiana market" (Filing No. 64-13; Filing No. 64-14).

The new plan reduced the Plaintiffs' commission on shared accounts from 7% to 6%, which reduced their combined commission on joint accounts from 14% to 12%, and it provided a new 10% commission on individual accounts (Filing No. 64-13; Filing No. 64-14). The additional rate provided Plaintiffs with the option to earn 3% more commission per account if they worked individually rather than in a partnership (Filing No. 64-4 at 95:1–3). However, Plaintiffs did not want to split up because they believed the partnership led to their success in their market and better quality of customer service, and that, ultimately, their income would have decreased with split accounts (Filing No. 64-4 at 172:22–173:23).

## C.   **Plaintiffs' Conversations Related to Restructuring**

Plaintiffs had several conversations with various managers at First American in January and February 2023 related to their commission restructuring. Plaintiffs detail five dates where managers provided different rationale for the restructuring.

### 1.   **January 11, 2023**

Burt informed Plaintiffs during a January 11, 2023 call that their team commission was being decreased to a combined 12% and that their salary was being reduced by 10%, (Filing No. 64-4 at 151:11–22). He told them that the reductions were due to nationwide corporate cuts and that all Sales Associates would have their salaries cut by 10% in 2023 (Filing No. 64-3 at 71:19–72:24, 113:19–21). He also told Plaintiffs that the reduction was because corporate, or upper management, did not like their partnership (Filing No. 64-2 at ¶ 9; Filing No. 64-3 at 74:2–8).

Later that day, Plaintiffs spoke with their regional sales director, King, about Burt's comments and recorded the call[1] (*See* Filing No. 70, Notice of Manual Filing). King explained to Plaintiffs that corporate had no issue with their partnership and that Burt did not say that correctly; rather, the issue was that the team effort costs the Indianapolis office more on a per-order deal than other offices (Filing No. 64-3 at 78:12–79:15; Filing No. 64-4 at 53:16–54:4; Filing No. 70 at 00:30–01:14).

### 2. **January 30, 2023**

On January 30, 2023, Plaintiffs met with Longere to discuss the reduction, and she told them the decision was not made by her (Filing No. 64-4 at 53:9–15; Filing No. 67, Ex. R at 02:10–02:18). Longere said that she reached the number that she was given to reduce overhead without reducing their commissions but then was told what was going to happen to the Plaintiffs (Filing No. 67, Ex. R at 02:30–03:22). On the call, Longere said that the commission cut decision came from Burt and St. George, but "pretty much" Burt. *Id.* at 03:25–03:32. Longere also said that she feels Plaintiffs are "paid really well", that she thought the restructuring plan was a decent compromise, and that Plaintiffs still made more than most other sales reps. *Id.* at 05:03–05:05, 06:45–07:05. During that same conversation, Longere stated upper management's reason for reducing Plaintiffs' commission was to keep it in line with other similar markets where Sales Associates do not make nearly as much. *Id.* at 17:00–17:14.

### 3. **February 18, 2023, February 14, 2023, and February 22, 2023**

Plaintiffs participated in three more meetings regarding the restructuring in February 2023. On February 8, Plaintiffs met with Longere, who told them they "cost too much" (Filing No. 64-2

---

[1] Chavez testified that she recorded some of her conversations with St. George, Longere, and Burt, because she had begun not to trust them. (Filing No. 64-2 at ¶22).

at ¶ 18). At a second meeting, on February 14, Longere stated that St. George supported their "duo" (Filing No. 64-2 at ¶ 19). On February 22, they met with St. George, who said that their commissions were too high and that First American cut Plaintiffs' commission because they made too much money (Filing No. 64-2 at ¶¶ 20–21; Filing No. 64-3 at 141:17–24; Filing No. 64-4 at 46:17–47:2).

### D.    **Other Sales Associates**

There were varying commission plans for other First American Sales Associates. In Indianapolis, the Sales Associates hired to fill Plaintiffs' roles after they left were hired with commissions rates of 1–5% and 10%; the Sales Associates located in Troy, Michigan had commission rates of 7% and 10%; the Sales Associates in Colorado had a commission rate of 8–10%; and the three Sales Associates in Chicago, Illinois had national commission rates of 9.9% to 10% (Filing No. 52-10; Filing No. 52-11; Filing No. 64-9; Filing No. 64-10; Filing No. 64-12; Filing No. 64-15; Filing No. 64-16; Filing No. 64-5 at 29:20). One Chicago Sales Associate also earned 15% for Illinois deals because Illinois has the lowest premiums in the country, so it was an incentive to increase the local market share for Chicago's local businesses (Filing No. 64-5 at 30:7–25).

## II.    **SUMMARY JUDGMENT STANDARD**

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.    DISCUSSION

Plaintiffs concede in their depositions that the national 10% reduction of salaries was not discriminatory (Filing No. 64-3 at 113:19–25; Filing No. 64-4 at 124:9–15). In addition, as First American points out, Plaintiffs' response provides no arguments on these allegations and focuses solely on the commission reduction (Filing No. 69 at 1; *see* Filing No. 64). Because Plaintiffs did not respond to First American's arguments, (Filing No. 52 at 4), and they did not view the salary reduction as discriminatory, they have waived any specific arguments in opposition to the dismissal

of their salary reduction claims. *B.E. v. Vigo Cnty. Sch. Corp.*, 608 F. Supp. 3d. 725, 736 (S.D. Ind. 2022) (citing *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010)).

The Court will proceed with its analysis on Plaintiffs' commission restructuring only and will first discuss the Title VII claims before turning to the Equal Pay Act claim.

**A.**    **Title VII Sex and National Origin Discrimination Claims (Counts I and III)**

Plaintiffs allege that First American reduced their commission due to their sex and national origin in violation of Title VII (Filing No. 8 at ¶¶ 28, 30). Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Seventh Circuit has held that "all discrimination cases present the same basic legal inquiry: At the summary-judgment stage, the proper question to ask is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff[s'] race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiffs'] discharge or other adverse employment action.'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters.*, Inc., 834 F.3d 760, 765 (7th Cir. 2016)) (emphasis omitted; alteration in original). However, as a means of "organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases," courts employ the well-known burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Under *McDonnell Douglas*, a plaintiff must first show that (1) she is a member of a protected class; (2) she performed her job to her employer's expectations; (3) she suffered an adverse employment action; and (4) a similarly situated individual outside her protected class received more favorable treatment. *Ferrill*, 860 F.3d at 500. If the plaintiff demonstrates these

elements, then "the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the challenged employment action." *Id.* "If the employer does this, then the burden shifts back to the plaintiff to produce evidence establishing a genuine dispute of fact about whether the employer's reason was a pretext for discrimination." *Id.*

It is undisputed that the Plaintiffs are members of a protected class, they were highly competent and successful in their positions, and they suffered an adverse action. First American argues only that Plaintiffs cannot satisfy the fourth element—that similarly situated individuals outside of the protected classes received better treatment—and there is no pretext, because there was a legitimate, nondiscriminatory reason for the adverse employment actions.

In contrast, Plaintiffs argue that similarly situated individuals were treated more favorably and First American's stated reason is pretextual. The Court will first address the fourth element and then turn to Plaintiffs' arguments of pretext.

### 1. **Similarly Situated Individuals**

First American argues the Plaintiffs cannot establish less favorable treatment than the relevant comparators (Filing No. 52 at 9). Specifically, it argues that the true comparators are the Sales Associates hired after they resigned, who are now working in Indianapolis and, potentially, those working in Troy, Michigan, as the same divisional area manager supervised them. *Id.* First American also argues that no commission plans, even including other area Sales Associates, were more favorable than Plaintiffs' commission plans and that no other Sales Associates received the benefit of increased commission rates when working in a partnership. *Id.* at 11; (Filing No. 69 at 7–8).

Plaintiffs present several employees as similarly situated non-Belarussian and non-Hispanic male salespeople who did not receive a commission reduction: Michael Davidson,

Zellinger, McIntosh, and Beckstedt (Filing No. 64 at 14). They argue that these comparators are outside of Plaintiffs' protected classes, they are Sales Associates in the Michigan and Indiana offices who have the same job duties, and St. George was the final decision maker on all their commission rates. *Id.*

"The similarly-situated analysis calls for a flexible, common-sense examination of all relevant factors. All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citation modified). "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 847 (citation modified).

For other Sales Associates to be considered similarly situated, the decision on whether to reduce commissions must have been made by the same decision maker who imposed the adverse employment action for Plaintiffs. *See Coleman*, 667 F.3d at 848 (clarifying that the "real question is whether they were treated more favorably by the same decisionmaker.") (internal quotation marks and citation omitted).

Although the record is inconsistent on the supervision structure, there is testimony from Longere, Burt, and St. George that Burt decided to reduce Plaintiffs' commissions. Plaintiffs also note Longere's deposition testimony stating that Burt was the ultimate decision maker in reducing their partnership commission (Filing No. 64 at 9–10 (citing Filing No. 64-7 at 42:21–25)). During her recorded meeting with Plaintiffs on January 30, 2023, Longere also discussed Burt's role as decision maker and said that the Indianapolis office does not report directly to St. George (Filing

No. 67, Ex. R at 14:24–14:28, 16:15–16:20). Burt testified that St. George "does not give the directive of what to do, the [profit center manager] at that office makes recommendations and submits it to [St. George]", that he proposed to reduce Plaintiffs' commission, and that it was his decision to decrease Plaintiffs' commission based on the budget (Filing No. 64-6 at 59:8–10, 67:10–16, 71:8–20). So while St. George might have approved the commission cuts, there is no evidence that she made the decision on which cuts to make. Based on the designated evidence, the Court considers Burt the decision maker here.

Burt managed the Sales Associates in Indiana and Michigan. Robin Brewer ("Brewer") – a white female; and Michael Davidson ("Davidson") – a white male were Sales Associates in Michigan (Filing No. 64-6 at 17:6–18:8). Viewing the facts in the light most favorable to Plaintiffs, the Michigan and Indiana offices had the same job duties, responsibilities, and supervisor involved in the decision to reduce commissions (Filing No. 64-6 at 46:15–25). So, the comparators are the Michigan Sales Associates.

Plaintiffs attempt to compare Chicago Sales Associates, but Burt did not manage those Sales Associates or determine their 2023 commission plans. Moreover, Burt did not reduce either of the Michigan Sales Associates' commissions, an American female and an American male, in the expense reduction period, in which he reduced Plaintiffs' partnership commission rate (Filing No. 64-6 at 21, 83:8–13, 84:19–25, 90:16–21, 91:19–92:2).

While the Court agrees with First American that Plaintiffs' commission *rate* was the same or higher than relevant comparators, the crux of the analysis here turns on whether the Court should look at the rates in the commission plans or the *reduction* in the commission plans to determine whether Plaintiffs were treated less favorably than similarly situated employees outside of their protected classes. First American takes the position that the overall commission rate for individuals

outside of their protected class is the relevant evidence for better treatment. Plaintiffs argue that the reduction in commission, rather than the commission rate, should be considered.

The Court agrees with Plaintiffs. The adverse action was the reduction in Plaintiffs' commission, therefore comparing reductions in commissions rather than overall rates is the proper way to determine whether Plaintiffs were treated less favorably. While it is true that Plaintiffs had the option of earning a higher 10% commission when working individually under the new plan, because they felt splitting their partnership would be less advantageous and did not want to change their account structure, the Court will consider only the commission reduction for the joint accounts in analyzing their treatment.

Working under the same conditions and with the same duties as the year before, Plaintiffs received 1% less commission under the updated plan in 2023. Plaintiffs have shown at least one similarly situated non-Hispanic and non-Belarussian male and female received more favorable treatment when they did not receive a reduction in commission.

The Court finds that when drawing all reasonable inferences in Plaintiffs' favor, they have shown that similarly situated individuals outside their protected classes were treated more favorably during the restructuring; therefore, they have established a *prima facie* case under *McDonnell Douglas*. The Court must now determine the remaining requirements: did First American have a legitimate, nondiscriminatory basis for the reduction in commissions, and was there pretext.

2.  **Legitimate Nondiscriminatory Basis**

Defendant argues that there was a legitimate, nondiscriminatory basis for the commission reductions, (Filing No. 52 at 12), and the Court agrees. Compensation reductions occurred nationwide at First American due to financial challenges, evidenced by company-wide layoffs,

furloughs, and salary cuts. Indeed, at the Indianapolis office where Plaintiffs worked, the decision was made to terminate four employees, including at least one non-Belarusian, non-Hispanic male (Filing No. 64-3 at 19; Filing No. 64-4 at 24; Filing No. 64-7 at 29:1–11).

The burden now shifts back to Plaintiffs to present evidence creating a factual dispute over whether the employer's stated reason for the adverse action was a pretext for sex or national origin discrimination.

### 3. **Pretext**

First American argues that Plaintiffs have designated no direct or circumstantial evidence to show discrimination based on gender or national origin and that its rationale for Plaintiffs' commission reductions did not shift to the level of pretext (Filing No. 52 at 12–13). Plaintiffs respond that the changing explanations for the commission reduction is proof of pretext (Filing No. 64 at 15).

Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005). The employee can show the proffered reason is pretextual by demonstrating that the reason (1) has no basis in fact, (2) did not actually motivate the adverse employment action, or (3) is insufficient to motivate the adverse employment action. *Gul-E-Rana Mirza v. The Neiman Marcus Group, Inc.*, 649 F. Supp. 2d 837, 849 (N.D. Ill. 2009). "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017) (internal quotation marks and citation omitted).

The Seventh Circuit has "set a high evidentiary bar for pretext." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 894 (7th Cir. 2016). To demonstrate pretext, a plaintiff can present evidence showing that (1) the defendant was "more likely than not motivated by a discriminatory reason" or (2) the

defendant's stated reason is not credible. *Alexander v. Wisconsin Dep't of Health & Family Servs.*, 263 F.3d 673, 682 (7th Cir. 2001) (quoting *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1039 (7th Cir. 1993)). When considering pretext at the summary judgment stage, "the only question before [the Court] is whether the plaintiff has provided evidence from which a rational trier of fact could infer the . . . stated reasons for taking the adverse action were lies." *Id.* at 683.

As First American points out, the reasoning was tied to necessary reductions in the amount spent by each office and this remained consistent in substance (Filing No. 52 at 14). While different managers in the Indianapolis office may have used different phrases to explain the restructuring, First American argues the underlying reason remained the same, the need for corporate cuts and the saving of money by reducing the Plaintiffs' joint commission. *See Rand v. CF Indus.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (finding summary judgment in favor of the employer proper when the proffered explanations were consistent "in substance if not word choice"). It is undisputed that First American made cuts through layoffs, furloughs, and salary and commission reductions. It is undisputed that the Plaintiffs' duo arrangement cost First American more per sale due to the commission structure, and reducing that joint percentage allowed First American to cut costs while still providing Plaintiffs with an option for a higher commission rate if they worked individually.

Plaintiffs outline complaints of discrimination in their response, but those general complaints came *after* the adverse employment action, so they do not support their claim of discrimination leading to the adverse action (*See* Filing No. 64 at 7–8; Filing No. 64-4 at 30:10–12)[2]. In addition to the belief that they were lied to and provided shifting explanations, McFadden testified that she believes that her commission was cut based on her gender and her national origin,

---

[2] On February 22, 2023 when Chavez met with Longere, and on February 23, 2023 when she met with St. George, Chavez informed them that she felt that she was being discriminated against because of how the commission decrease was presented. (Filing No. 64-2).

"because other reps did not get cut." (Filing No. 64-3 at 186:13–17). Chavez testified that she believes her race and gender were the reason for the commission cut because "the guys in Chicago didn't get a cut" and there were no "other white male people" that got cut (Filing No. 64-4 at 114:3–115:10). But based on the lack of evidence, the Court fails to see the link between gender and national origin to the commission restructuring. *See Cole v. Bd. of Trs. Of N. Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016) ("Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus.").

Plaintiffs next point to inadmissible hearsay evidence from a former employee of Asian descent who told McFadden that she felt she was treated unfairly due to her sex and national origin during her time at First American (Filing No. 64-3 at 108:19–24). Plaintiffs also allege the former employee stated that Longere made comments about Asian people being very influenced by their parents, but, again, this is hearsay, and neither McFadden nor Chavez is of Asian descent. *Id.* at 109:9–21.

McFadden testified that Longere once made a comment about Russian women being very stubborn and very direct, which she found offensive (Filing No. 64-3 at 29; 110:2–7, 111:2–3). However, she does not recall when that comment was made,  she concedes that the comment was not made during the time the commission decisions were being made, and McFadden could not recall Longere making any other statements about her national origin. *Id.* at 110:10–15, 111:11–14. McFadden never reported that statement to anyone, and McFadden heard no other negative comments about her national origin from anyone at First American. *Id.* at 148:1–11.

The evidence supporting Chavez's claims of discriminatory motive is equally limited. Chavez testified that she had a harder time getting commission splits approved as an ethnic woman

(Filing No. 64-4 at 29:15–30:9). But she does not recall specific situations or people who made it harder, and she never complained about unfair treatment due to her ethnicity or gender prior to 2023. *Id.* at 30:10–12. Chavez said, without providing details, that she "think[s] there were some instances" of unfair treatment due to her ethnicity or gender, "but mainly the commission cuts really made [her] feel it." *Id.* at 32:19–25. She also testified that during her twenty-year tenure at First American, no one made any derogatory or disparaging statements about her race, national origin, or gender. *Id*. at 124:2–8.

Finally, Plaintiffs cite to a recorded statement from Longere about it being a "boys' club" on the managers' calls (Filing No. 64-3 at 93:10–15; Filing No. 64-4 at 58:6–12; Filing No. 67, Ex. R at 22:15–20). But Longere did not decide to reduce their partnership commission rate, so this statement does not satisfy Plaintiffs' burden. *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000). Moreover, the "boys' club" comments were not "causally related to the discharge decision-making process" because Plaintiffs admit that they took Longere's comment to mean that Burt overruled her and that their line of business was male dominated—not that their commission cuts were related to their gender. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012); (Filing No. 64-3 at 95:14-96:11; Filing No. 64-4 at 58:3-59:18). Longere testified that at the time of that comment there had been a change in divisional leadership from a female who she really liked to a male which frustrated her, and it was a poor choice of words (Filing No. 64-7 at 127:17–23). Listening to the audio confirms that in the context of the call, the "boys' club" comment was during a conversation about changes in management structure not commission restructuring (Filing No. 67, Ex. R at 22:15–20).

Ultimately, when evaluating a Title VII discrimination claim, a district court must determine "whether the evidence would permit a reasonable factfinder to conclude that the

plaintiff[s'] [sex or national origin] caused" the adverse action. *Ortiz*, 834 F.3d at 765. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Id.* The Seventh Circuit reiterated that a reasonable juror would need to conclude that Plaintiffs would have kept their commission if they had a different national origin or sex, and "everything else had remained the same." *Nigro v. Ind. Univ. Health Care Assocs.*, 40 F.4th 488, 491 (7th Cir. 2022) (citing *Ortiz*, 834 F.3d at 764).

Nothing in the record connects the Plaintiff's new commission plan to some form of gender or racial animus or intent to discriminate based on the Plaintiffs sex or national origin. "In determining whether [a party's] reason can be characterized as pretextual, [the Court] do[es] not evaluate whether the [party's] proffered justification was accurate or even whether it was unfair. [The Court's] sole focus is on whether the [party's] stated reason can be characterized as a falsehood rather than an honestly held belief." *Robertson v. Dep't of Health Services*, 949 F.3d 371, 378 (7th Cir. 2020). There is no evidence that Plaintiff's stated reasons for the new commission plan–the nationwide directive that it must reduce costs in Indiana by $300,000.00, and that restructuring the duo was cost effective –was false.

The Court finds that a reasonable juror could not make such a conclusion. If Plaintiffs had different national origins and genders, Plaintiffs' high partnership commission rate and the necessary corporate cuts would have still led to a commission restructuring. The designated evidence, including the covertly recorded calls, show that the commission decision was clearly a business decision—and had nothing to do with Plaintiffs' gender or national origins. In sum, Plaintiffs have not provided sufficient evidence to raise a genuine issue of fact that their commission was reduced *because* of their female sex or national origin.

18

Accordingly, First American's Motion for Summary Judgment as to Plaintiffs' claims for sex and national origin discrimination under Title VII is **granted**.

**B.**    **Equal Pay Act Claim (Count II)**

Similarly, Plaintiffs failed to designate necessary evidence to survive summary judgement in their Equal Pay Act claim. The Equal Pay Act prohibits employers from discriminating between its employees by paying an employee lower wages than the employer pays an employee of the opposite sex. 29 U.S.C. § 206(d)(1). An employee establishes a *prima facie* claim under the Equal Pay Act by demonstrating a difference in pay despite having a job that requires "equal skill, effort, and responsibility" as the comparator and a job that is performed under similar working conditions to the comparator. *Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1008 (7th Cir. 2018) (citing *Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017)); *see also King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012).

In their reply, First American argues the Plaintiffs cannot reasonably dispute that they were paid higher rates than their comparators and they "were each making well over a million dollars annually through their employment with [First American] by collecting a higher percentage of commissionable revenue than any alleged comparator." (Filing No. 69 at 1). The evidence submitted by Plaintiffs does not establish a *prima facie* claim under the Equal Pay Act. Plaintiffs have not shown that they were paid lower wages than employees of the opposite sex or national origin, for a job performed under similar working conditions to comparators with equal responsibilities.

The Equal Pay Act specifically deals with differences in pay. The parties have not submitted evidence concerning their salaries, so the Court focuses only on the commission rates. While working as partners on an account Plaintiffs earned less—6% each—because they *split the*

*responsibilities* of the account. Plaintiffs' argument inappropriately compares the 6% split rate instead of the combined 12% rate for the same responsibilities for a single sale. At the decreased partnership commission rate, Plaintiffs still made *more* commission combined than the alleged male comparators on each national account—12%. This rate is 2% more on national sales than the male Sales Associate who outearned Plaintiffs on commission for his Illinois sales (*See* Filing No. 64-15).

Further, there is no doubt that the new 2023 commission plan provided Plaintiffs the same or better commission rates than male Sales Associates when working individually. While Plaintiffs did not want to split their partnership, ultimately, the choice to work in a partnership with reduced responsibilities and reduced commission was theirs. The undisputed evidence shows that Plaintiffs' compensation was the same or better than all but one man for each account they worked *individually*—10% commission on each sale. The only exception is one male Sales Associate with a commission agreement of 15% on Illinois market sales only, but he received the same 10% commission as Plaintiffs on national sales (Filing No. 64-15).

In their affidavits, Plaintiffs state that three male Illinois Sales Associates—Zellinger, McIntosh, and Beckstedt—received "greatly higher overall compensation,"[3] even though their positions required the same skill, effort, and responsibility and involved similar working conditions at First American (Filing No. 52-2 at ¶¶ 29–30; Filing No. 52-3 at ¶¶ 25–26). But this argument fails to acknowledge the separate geographic areas and the Plaintiffs' partnership which decreases individual responsibilities for the duo. The Equal Pay Act prevents pay disparities at the same establishment which is defined as "the same geographical office, or at least the same city or metropolitan area." *Jaburek v. Foxx*, 813 F.3d 626, 632 (7th Cir. 2016) (citing 29 C.F.R. §

---

[3] As discussed above, the only compensation evidence proffered relates to commission, so the Court considers only the commission rates.

1620.9(a)). Here, the only evidence of higher wages paid to a male employee is a Sales Associate based in Chicago that earns higher commission on Illinois specific sales—a different office, city, and metropolitan area from Plaintiffs.

Because Plaintiffs have not shown that they can satisfy the elements of their *prima facie* case, their Equal Pay Act claims fail, and First American is entitled to summary judgment.

## IV.    <u>CONCLUSION</u>

For the reasons discussed above, First American's Motion for Summary Judgment (<u>Filing No. 51</u>) is **GRANTED**. McFadden and Chavez's Title VII and Equal Pay Act claims are **DISMISSED with prejudice** on summary judgment.

Final judgment will issue under separate order.

**SO ORDERED.**

Date:    3/9/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

John Babione
Constangy, Brooks, Smith & Prophete, LLP.
jbabione@constangy.com

Amber K. Boyd
Amber Boyd Attorney at Law
amber@amberboydlaw.com

Joyce Dos Santos
Constangy, Brooks, Smith & Prophete LLP
jdossantos@constangy.com

David Charles Kurtz
Constangy, Brooks, Smith & Prophete, LLP.
dkurtz@constangy.com

Stephen Rollins, II
Amber Boyd Law
stephen@amberboydlaw.com

Monica Towle
Constangy, Brooks, Smith & Prophete LLP
mtowle@constangy.com